**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 13-cv-01249-REB-KLM

JANEEN MEDINA, individually, and on behalf of all others similarly situated, and on
behalf of the CHI Plans,

      Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES, et al.,

      Defendants.

---

## ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

---

**Blackburn, J.**

The matters before me are (1) **Plaintiff's Motion for Partial Summary
Judgment** [#308],[1] filed August 13, 2015; (2) **Defendants' Motion for Summary
Judgment** [#302], filed August 13, 2015; and (3) **Defendant Edward Speed's for
Summary Judgment** [#296], filed August 13, 2015.  I grant Catholic Health Initiatives's
motion in relevant part, deny plaintiff's motion, and deny Mr. Speed's motion as moot.[2]

### I.  JURISDICTION

I have jurisdiction over this matter under 28 U.S.C. § 1331 (federal question).

### II.  STANDARD OF REVIEW

---

[1]  "[#308]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's case management and electronic case filing system (CM/ECF).  I use this
convention throughout this order.

[2]  The issues raised by and inherent to the motion for summary judgment are fully briefed,
obviating the necessity for evidentiary hearing or oral argument.

Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. **FED. R. CIV. P.** 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.[3]

A party who does not have the burden of proof at trial must show the absence of a genuine dispute. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1315 (1995). By contrast, a movant who bears the burden of proof must submit evidence to establish every essential element of its claim. *See In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002). In either case, once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. *Concrete Works*, 36 F.3d at 1518. All the evidence must be viewed in the light

---

[3] These standards are unchanged by the fact that the court will be the ultimate trier of fact in this matter. *See Medical Institute of Minnesota. v. National Association of Trade & Technical Schools*, 817 F.2d 1310, 1315 (8th Cir. 1987) ("A judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury."). *See also In re Unisys Savings Plan Litigation*, 74 F.3d 420, 433 (3rd Cir. 1996) ("[E]ven if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from those facts.").

most favorable to the party opposing the motion. ***Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services***, 165 F.3d 1321, 1326 (10th Cir.), ***cert. denied***, 120 S.Ct. 53 (1999).

## III. ANALYSIS

Plaintiff, a former employee of Catholic Health Initiatives ("CHI"), bring this putative class action lawsuit under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), against CHI and the members of its Board of Stewardship Trustees (the "BOST") and Human Resources Committee (the "HR Committee"). CHI offers employees retirement benefits through a defined benefit pension plan, the Catholic Health Initiatives Retirement Plan (the "CHI Plan" or the "Plan"). The Plan is sponsored by CHI and administered by the CHI & Affiliates Defined Benefit Plan Subcommittee (the "DB Plan Subcommittee" or the "Subcommittee), a subcommittee of the HR Committee.

The CHI Plan, established January 1, 1997, states specifically that it is intended to qualify as a "church plan" (**CHI Motion App.**, Exh. 1 ¶ II at 2), and it has been recognized as such by the Internal Revenue Service since 2002 (***id.***, Exh. 49). Church plans are specifically exempt from compliance with the requirements of ERISA. 29 U.S.C. § 1003(b)(2) ("The provisions of this subchapter shall not apply to any employee benefit plan if ... such plan is a church plan (as defined in section 1002(33) of this title)[.]")). ***See also Chronister v. Baptist Health***, 442 F.3d 648, 651 (8th Cir. 2006) ("Church plans are not ERISA plans."). By this lawsuit, plaintiff challenges that designation and contends the CHI Plan should be required to comply with ERISA.

3

The majority of plaintiff's claims are premised on the notion that CHI has violated various of the myriad requirements of ERISA.  The viability of those claims turns entirely on whether the CHI Plan is entitled to claim the benefit of ERISA's church plan exemption.  Before answering that fundamental question, it is necessary to describe the parameters of the exemption itself, as well as to explore the history and structure of CHI.

## A.  THE CHURCH PLAN EXEMPTION

I begin by examining the parameters and requirements of ERISA's church plan exemption.  The term "church plan" is defined by statute as

> . . . a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

29 U.S.C.A. § 1002(33)(A).  That definition is further elaborated as follows:

> For purposes of this paragraph – (i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

*Id.* § 1002(33)(C)(i).  I have interpreted these sections to mean that a plan may qualify for the church plan exemption if it meets the requirements of *either* subsection (A) *or* subsection (C):

> Subsection (C) clearly evinces an intent to broaden the availability of the exemption such that churches themselves need not be involved directly in the administration of their employee benefit plans in order to qualify.  To that end, subsection (C) describes a particular way in which a church plan may meet the requirement that it be "established and maintained" by a church – that is, if it is maintained by an organization controlled by or associated with a church or convention of churches.  This interpretation is driven by the language of the subsection itself, which states that a plan "established and maintained" as a church plan "*includes*" such a plan.  In other words, "under the rules of grammar and logic, . . . if A is exempt and A includes C, then C is also exempt."

(**Order Sustaining Objection to and Rejecting Recommendation of United States Magistrate Judge** at 4 [#214], filed August 26, 2014 (citations omitted; emphasis in original).)

Thus, a plan may qualify initially for the church plan exemption under two circumstances.  First, a plan may constitute a church plan if it was established and maintained by a church or a convention or association of churches.  Alternatively, a plan may constitute a church plan if it is maintained by an organization which meets two further criteria:  (1) the principal purpose or function of the organization is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches;[4] and (2) the organization is controlled by or associated with a church or a convention or association of churches.  29 U.S.C. § 1002(33)(C)(i).  Under ERISA, an

---

[4]  The term "employee of a church" is defined by statute to include "an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii)(II).

organization is "associated" with a church " if it shares common religious bonds and convictions with that church or convention or association of churches." *Id.* § 1002(33)(C)(iv).   A plan which meets all the foregoing criteria nevertheless may not be classified as a church plan, *inter alia*, "if less than substantially all of the individuals included in the plan are individuals described in subparagraph (A) or in clause (ii) of subparagraph (C)." *Id.* § 1002(33)(B)(2).[5]

Plaintiff argues that CHI is neither a church nor controlled by or associated with a church.  She further maintains that a substantial percentage of employees covered by the CHI Plan are not employed by such a church-associated organization.  To analyze those arguments properly, however, appropriate context is required.  I thus turn to examine the history and structure of CHI.

## B.  HISTORY AND STRUCTURE OF CHI

The history of orders of Catholic brothers and sisters providing healing ministries in their communities dates back to the Middle Ages.  "During those years, various religious groups – vowed and lay, composed of women or men – cared for the needs of the sick and often lived among the sick poor:"

> [The view of providing healing to the sick as an individual vocation] changed . . . in the 18th and 19th centuries as more and more religious communities of women were founded to carry out particular apostolic activities.  Caring for the sick . . . became a communal vocation.  When these religious communities came to the United States, hospitals were among the institutions that they founded.
>
> In 1727, the Ursuline sisters became the first Catholic

---

[5]  A plan may be disqualified " also if the employees (or their beneficiaries) of the church which established the plan are employed in connection with one or more unrelated trades or businesses."  29 U.S.C. § 1002(33)(B)(1).  That circumstance is not implicated by the parties' arguments here.

congregation of women to come to America.  Their apostolic works included the care of the sick. . . .  In the 1800s came more Catholic sisters who saw their task as caring for the physical and spiritual needs of the Catholic immigrant population.

The explicit mission of many of these communities was care for the sick [and the] poor. . . .  About five of the 16 religious communities of women that were in the United States in 1849 were involved in health care.  By 1875 there were 75 Catholic hospitals.  By the beginning of the 20th century there were almost 400.

. . . .

This tradition of care for the poor has continued to the present day.  It is expressed in the mission statements and the lists of core values that are now part of Catholic health care.

. . . .

Almost invariably the mission and/or vision statements of the various Catholic health-care systems articulate that the work of the system is a participation in the healing ministry of Christ, which includes a commitment to the poor and vulnerable.

Thomas Nairn, *The Catholic Tradition of Health Care*, St. Anthony Messenger

(available at http://www.americancatholic.org/Messenger/May2010/Feature6.asp) (last

accessed December 4, 2015).

In June 1991, the Congregation for Institutes of Consecrated Life and Societies

of Apostolic Life (the "Congregation"), a department of the Holy See in the Vatican,

approved a petition to confer public juridic personality on Catholic Health Care

Federation ("CHCF").  (**CHI Motion App.**, Exh. 10.)  Established pursuant to the Code

of Canon Law, *see Codex Iuris Conanici* [hereinafter "CIC"] cc. 113-123 (1983)

(available at http://www.vatican.va/archive/ENG1104/__PD.HTM) (last accessed

7

December 4, 2015), public juridic persons are

> aggregates of persons *(universitates personarum)* or of things (*universitates rerum*) which are constituted by competent ecclesiastical authority so that, within the purposes set out for them, they fulfill in the name of the Church, according to the norm of the prescripts of the law, the proper function entrusted to them in view of the public good.

*Id.*, c. 116 § 1.  Public juridic persons are the official constitutive parts of the Catholic Church and the primary means through which the Church acts in the world.  (**See CHI Motion App.**, Exh. 3 at 47-48, 107-108; Exh. 5 ¶ 7 at 3.)[6]  ***See also Public Juridic Persons in the Church Conference***, Governance & Management Pty. Ltd. (Sydney, Australia Feb. 2009) ("A Public Juridic Person is a legal entity under canon law that allows the Church's ministries to function in the name of the Catholic Church.") (available at http://www.governance.com.au/events/dsp-default.cfm?loadref=8) (last accessed December 4, 2015).

CHCF's canonical statutes affirm its Catholic identity and mission:

> The purpose of [CHCF] shall be to embody the mission of the healing ministry of Jesus in the Church through the ownership, management and governance of health ministries, and the offering of programs and services consistent with that purpose in keeping with the Gospel imperative.  Its operation shall be conducted in a manner which is consistent with the teachings and laws of the Roman Catholic Church.  It will adhere to the <u>Ethical and Religious Directives for Catholic Health Care Services</u> promulgated by the United States Conference of Catholic Bishops (or any successor organization) and as interpreted by the local Ordinary.

(**CHI Motion App.**, Exh. 12 art. II at 2.)  Although CHCF has autonomy (***see id.***, art. IV

---

[6] Other examples of public juridic persons are dioceses, parishes, and religious orders.  (**CHI Motion App.**, Exh. 3 at 47; Exh. 4 ¶ 29 at 8; Exh. 8 at 37-38.)

at 3), it remains "subject to and accountable to" the Congregation in myriad ways  (*id.* art. V at 3-4).[7]

Public juridic persons such as CHCF, however, are creatures of canon law, and thus have no ability to act or own property in the United States on their own.  To do so, they require a civil law counterpart.  (*See id.*, Exh. 5 ¶ 15 at 4.)  CHI is this civil law identity of CHCF.  (*See id.*, Exh. 21 art. V (providing that CHI "shall be sponsored by"

---

[7]  Specifically, CHFC's statutes provide that CHFC "shall be subject to and accountable to the Congregation for the Institutes of Consecrated Life and Societies of Apostolic  Life in the following ways:"

    1.  The Congregation for the Institutes of Consecrated Life and Societies of Apostolic Life shall approve:

        A.  Maintain vigilance that the integrity of faith and morals is preserved and that the apostolic activity of Catholic Health Care Federation is for the common good;

        B.  Receive the annual report of Catholic Health Care Federation;

        C.  Monitor the use of the temporal goods of the juridic person to determine if the use is in  accord with the purpose of Catholic Health Care Federation.

    2.  The Congregation for the Institutes of Consecrated Life and Societies of Apostolic Life shall also:

        A.  Maintain vigilance that the integrity of faith and morals is preserved and that the apostolic activity of Catholic Health Care Federation is for the common good;

        B.  Receive the annual report of Catholic Health Care Federation;

        C.  Monitor the use of the temporal goods of the juridic person to determine if the use is in accord with the purpose of Catholic Health Care Federation.

(**CHI Motion App.**, Exh. 12 art. V at 4.)

CHCF).)[8]  CHI was formed in 1996 through the consolidation of three health care

systems representing ten congregations of Catholic sisters.[9]  (***See id.***, Exh. 9 at 9 of 21

[CHI_0013683].)  It is expressly "organized and operated . . . exclusively for the benefit

of, to perform the functions of, and/or to carry out the religious, charitable, scientific, and

educational purposes . . . of Catholic Health Care Federation."  (***Id.***, Exh. 21 art. III, §

3.2.)  In other words, as conceived by the Church itself, CHCF and CHI are seen as the

church and civil counterparts of a single entity.  (***See id.***, Exh. 7 at 41-42, 162-163; Exh.

8 at 93; Exh. 19 at 24, 26-27; Exh. 22 at 40-41; Exh. 23 at 217; Exh. 24 at 40-41.)

This coincidence of identity between CHCF and CHI is reflected in several ways.

CHI's governing body, the Board of Stewardship Trustees ("BOST") (***see id.***, Exh. 21

art. VII, § 7.2), "consist[s] of no fewer than nine (9) nor more than twenty-one (21)

individuals who shall be the same physical persons as the Members of CHCF, a

pontifical public juridic person" (***id.***, Exh. 20 art. IV, § 4.2).  The property CHI employs in

its ministry is CHCF's property under canon (i.e. Catholic) law and must be

administered in accordance therewith.  ***See CIC*** cc. 1256 & 1284, § 2.  (***See also* CHI**

**Motion App.**, Exh. 20 § 1.6.)  CHI may not sell or otherwise alienate any such property

without the approval of CHCF (**CHI Motion App.**, Exh. 20 § 1.6),[10] and if the value of

_____

[8] Through sponsorship, the public juridic person provides oversight, endorsement, and support to the sponsored entity, allowing it to have a Catholic identity and ensuring that it adheres to Catholic teachings.  (***See* CHI Motion App.**, Ex. 11 at 42-43; Ex. 16 ¶ II.C.3 at 31-35; Ex. 7 at 16-17.)

[9] CHCF originally sponsored one of the constituent health care systems of CHI – Catholic Health Corporation ("CHC") of Omaha, Nebraska.

[10] Plaintiff's citation to a draft letter to a merger partner suggesting otherwise is misleading. (***See* Plf. Resp. Br.** at 20 n.9 & **Resp. App.**, Exh. 59 at CHI_0675628.)  After further review, CHI's canon lawyer and theologian corrected the impression that CHCF's approval was not required to consummate the transaction.  (**CHI Motion App.**, Exh. 3 at CHI_0725536.)

the transaction exceeds a prescribed threshold, the Vatican must approve the transaction as well (*id.*, Exh. 12 art. V.1.B).

As the civil law counterpart of the canonical public juridic person CHCF, CHI endeavors to "embody the mission of the healing ministry of Jesus in the Church through ownership, management, or governance of health ministries, or the offering of or supporting of charitable and religious programs or services consistent with such purposes, in keeping with the Gospel imperative." (*Id.*, Exh. 21 art. III, § 3.2.)[11] The Articles of Incorporation require that CHI "be operated exclusively in furtherance of these purposes and in conformity with the ethical and moral teachings of the Roman Catholic Church and the Ethical and Religious Directives for Catholic Health Care Services [the 'ERDs'], as promulgated by the United States Conference of Catholic Bishops." (*Id.*) Compliance with the ERDs ensures that CHI provides health care in conformity with Catholic doctrine.[12] Compliance with the ERDs is enforced by CHI's Mission Group (*see id.*, Exh. 30), in consultation with and as overseen by the bishops in each of the dioceses in which CHI operates, *see CIC*, cc. 381 § 1 & 392. (*See also* **CHI Motion App.**, Exh. 3 at 119-20; Exh. 4 ¶¶ 91-92 at 20-21; Exh. 8 at 93-95; Exh. 11 at 149-50.) Moreover, Catholic sisters who are part of CHI's founding religious orders continue to be involved in the governance of CHI through membership on the BOST.

---

[11] This imperative "urges [CHI] to emphasize human dignity and social justice," as well as "concern for persons who are poor, alienated, and underserved." (**CHI Motion App.**, Exh. 21 art. III, § 3.1.)

[12] The ERDs present the "theological principles that guide the Church's vision of health care," and are intended to establish "ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person," "to provide authoritative guidance on certain moral issues that face Catholic health care today," and to "promote and protect the truths of the Catholic faith as those truths are brought to bear on concrete issues in health care." (**CHI Motion App.**, Exh. 29 at 3-4, 5.)

(**CHI Motion App.**, Exh. 24 at 34-35.)[13]

In addition, CHI is listed in *The Official Catholic Directory*, "the definitive compilation of Roman Catholic institutions in the United States." *Hartwig v. Albertus Magnus College*, 93 F.Supp.2d 200, 202-03 (D. Conn. 2000). (*See* **CHI Motion App.**, Exh. 34.) CHI's listing in *The Official Catholic Directory* signifies that the Archbishop of Denver has made a determination that CHI is "an official part of the Catholic Church." (**CHI Motion App.**, Exh. 3 at 105.) *See also Overall v. Ascension*, 23 F.Supp.3d 816, 831 (E.D. Mich. 2014) (inclusion in *The Official Catholic Directory* denotes that listed organization is "'operated, supervised, or controlled by or in connection with the Roman Catholic Church'") (quoting U.S. Catholic Bishops' Guidelines). Importantly, that certification must be renewed annually. (*See* **CHI Motion App.**, Exh. 3 at 104-105.) *See also* The Catholic Directory, **World Map, U.S. Map, The Official Catholic Directory** ("The [Official Catholic Directory] is updated and approved annually by each Catholic diocese.") (available at http://www.thecatholicdirectory.com/dsp_official.cfm) (last accessed December 4, 2015).

Further, under the Internal Revenue Service's interpretation of ERISA's church plan exemption, "[a]ny organization listed in [*The Official Catholic Directory*] is considered associated with the Roman Catholic Church in the United States," and an employee of any such organization "is considered as an employee of the Roman Catholic Church of the United States for purposes of the church plan rules." **IRS General Counsel Memorandum 39007**, 1983 WL 197946 at *4 (July 1, 1983). (*See*

---

[13] Nine of the individually named BOST defendants are Catholic sisters.

*also* **CHI Motion App.**, Exh. 3.)  Consistent with that interpretation, the IRS issued a

Private Letter Ruling ("PLR") to CHI in 2002 confirming that the CHI plan was a church

plan.  (**CHI Motion App.**, Exh. 49 at 7.)[14]

CHI's ties to the Catholic Church extend downward to the DB Plan

Subcommittee, which manages and administers the Plan.  All members of the

Subcommittee are appointed by the BOST.  (*Id.*, Exh. 1 §§ 1.32 at 8, 12.1 at 42.)[15]  All

expenses of Plan administration are paid by CHI.  (*Id.*, Exh. 1 § 12.1 at 42.)  In

administering the Plan and carrying out its duties (*see id.*, Exh. 1 § 12,3 at 43), the

Subcommittee must "be mindful of the Employer's Philosophy and Mission, and the

teachings and tenets of the Roman Catholic Church and of the Sponsoring

Congregations of Catholic Health Initiatives" (*Id.*, Exh. 1 art. XII, § 12.2 at 43).  In case

this description were not sufficiently pellucid, the Plan document provides explicitly that

the Subcommittee "shares common religious bonds with the Roman Catholic Church

and the Sponsoring Congregation of Catholic Health Initiatives."  (*Id.*)

Against this background, the court may consider now the seminal question in this

case: whether CHI is a church for purposes of ERISA's church plan exemption.

---

[14]  A PLR is a written statement issued by the IRS to a taxpayer that interprets and applies tax laws to the taxpayer's specific set of facts.  26 C.F.R. § 601.201(a)(2); *see also* **IRS Revenue Procedure** 2015-1 § 2.01, 2015 WL 44244 (IRS Jan. 2, 2015).  "A taxpayer ordinarily may rely upon a private letter ruling received from the IRS."  *Porter v. Ogden, Newell & Welch*, 241 F.3d 1334, 1337 n.2 (11th Cir. 2001).  *See also* **IRS Revenue Procedure** 2015-1 § 11.01.

[15]  The Subcommittee exercises its authority under a full delegation of administrative responsibilities from the HR Committee.  (*See* **Def. Motion To Dismiss** [#39] **App.**, Exh. C at 1.)

## C.  IS THE CHI PLAN A CHURCH PLAN?

As noted previously, a plan may qualify as a church plan under ERISA if it is "established and maintained . . .  by a church or by a convention or association of churches[.]"  29 U.S.C.A. § 1002(33)(A).  ERISA neither defines the term "church" nor delineates any indicia for classification as a church.  Neither party has cited the court to any decision defining the term "church" under ERISA, and the court has found none.  Invoking normal rules of statutory construction, however, plaintiff argues that the term should be given its plain meaning.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988).  I concur, but conclude that plaintiff's proposed definition is overly simplistic and ultimately untenable.

Plaintiff suggests that the plain meaning of "church" is simply "a house of worship."  Indisputably, this definition encompasses some aspect of what it means to be a church.  *See* Dictionary.com, *"Church"* (offering as one definition of "church" "a building for public Christian worship") (available at http://dictionary.reference.com/browse/church) (last accessed December 4, 2015).  Nevertheless, it is immediately apparent that plaintiff's definition is not defensible, since it refers quite literally to a physical building, which as such cannot establish or maintain anything.

Apart from this rather obvious reality, plaintiff's alleged reliance on a plain meaning interpretation conveniently ignores other plain meanings of the term "church" which evince richer and more meaningful denotations and connotations of that term.  Thus, it is equally plain that the term "church" can and may be used to denote "the whole body of Christian believers," or "any division of this body professing the same

14

creed and acknowledging the same ecclesiastical authority," as well as an "ecclesiastical organization, power, and affairs, as distinguished from the state." ***See id***. These broader conceptions of the term find parallels in definitions of the Roman Catholic Church in particular.  ***See, e.g.***, ***id.***, ***"Catholic Church"*** (defining the Roman Catholic Church as "a visible society of baptized Christians professing the same faith under the authority of the invisible head (Christ) and the authority of the visible head (the pope and the bishops in communion with him)"); Catholic Dictionary, ***Church, Definition*** ("The faithful of the whole world. . . . . [A] union of human beings who are united by the profession of the same Christian faith, and by participation of and in the same sacraments under the direction of their lawful pastors, especially of the one representative of Christ on earth, the Bishop of Rome.") (available at (https://www.catholicculture.org/culture/library/dictionary/index.cfm?id=32533) (last accessed December 4, 2015; New Advent, ***Catholic Encyclopedia:  The Church*** ("The term, in its full meaning, denotes the whole body of the faithful, both rulers and ruled, throughout the world . . . .  A body of men united together by the profession of the same Christian Faith, and by participation in the same sacraments, under the governance of lawful pastors, more especially of the Roman Pontiff[.]") (citation and internal quotation marks omitted) (available at http://www.newadvent.org/cathen/03744a.htm) (last accessed December 4, 2015).

These broader, yet still plain-meaning, definitions make manifest that the suggestion that a church is no more than a physical place in which to worship evidences a profound misunderstanding and understatement of the nature of religious devotion and service.  At the heart of any church are the religious principles that inform its

founding, as animated by the faithful adherents to those principles.  Indeed, there would be no need for a house in which to worship if there were no worshipers to gather there. In other words, a church is defined principally by its people – the body of the faithful who profess a similar set of guiding religious principles.  Where such people gather to express, in word or deed, the principles and mission of their faith, they are the church.

Under this more resonant definition, the court has little trouble in concluding that CHI is, at the very least, a constituent part of the Catholic Church.  As explained above, CHI is the civil identity of CHCF.  Just as CHCF, the public juridic person, allows the Church to pursue its ministry under canon law, CHI permits that ministry to operate in secular society.  The very purpose of CHI is to implement the religious, charitable, scientific, and educational purposes of CHFC.  CHI's compliance with Catholic doctrine is ensured by the organizational requirement that it be operated in conformity with the ERDs, which compliance is monitored by the bishops of the various dioceses in which CHI operates.  Moreover, the Catholic Church itself has recognized CHI as an official, constitutive part of the Church by consistently listing it in *The Official Catholic Directory*,[16] which recognition the IRS has long accepted as sufficient to render an employee of any such institution an employee of the Catholic Church.[17]

---

[16]  Plaintiff's suggestion that continued inclusion in *The Official Catholic Directory* is suspect because CHI's business allegedly has "changed materially" is wholly unsubstantiated and conveniently ignores that inclusion in that publication is assessed annually.  Moreover, consideration of plaintiff's argument would require the court to determine whether the Catholic Church properly has designated CHI as an official part of the Church.  As discussed further below, that path is not one which a judicial officer is authorized to follow.

[17]  I note that these considerations mirror those the Department of Labor uses in determining whether an organization is a church for purposes of the church plan exemption, including whether

> a religious order or congregation controls the entities sponsoring the plan; the operation of the organization furthers the goals of the religious order; the entity and/or the religious order are listed in an official religious

Attempting to contravene this evidence, plaintiff contends that CHCF is not a church but a company, pointing out that it holds meetings, appoints members, and offers educational training.  Indeed, the designation "public juridic person" is the canonical term for a church corporation.  (*See* **CHI Motion App.**, Exh. 8 at 37-38 (noting that "[p]ublic juridic person is a canon law term for company").)  Nevertheless, there is nothing self-evident in plaintiff's tacit assumption that church status is impaired or destroyed simply because the church operates on a business model.  Moreover, plaintiff's repeated use of the term "conglomerate" to refer to CHI ignores that the Catholic Church itself (not unlike other established world religions) is a huge conglomerate that operates in various forms and formats, including corporate ones.

Likewise, the unremarkable fact that CHI and CHFC are separate legal entities does nothing to bolster plaintiff's arguments.  The substantial overlap in the membership of the board of directors and the officers of both CHCF and CHI only reinforces how intertwined the two entities are.  Although members may owe separate fiduciary duties to each organization, plaintiff offers neither argument nor evidence to suggest that these duties actually conflict.  Indeed, such a lack of substantiation seems unsurprising given the identity of purpose between CHCF and CHI.

Nevertheless, plaintiff warns that defining CHI, a constituent *part* of a church, as *the* church itself would "lead to absurd results" under ERISA.  Although I am not thoroughly convinced that such is the case, I ultimately need not determine whether CHI

_____

directory; the organization is a not-for-profit tax exempt entity pursuant to § 501 of the Internal Revenue Code; and members of the religious order sit on the board of directors of the organization.

*Friend v. Ancilla Systems Inc.*, 68 F. Supp. 2d 969, 972 (N.D. Ill. 1999).

itself is a church for purposes of ERISA section 1002(33)(A), because the foregoing

evidence more than adequately demonstrates that the CHI Plan satisfies the

requirements of section 1002(33)(C).

To reiterate, under subsection (C), a plan may qualify for the church plan

exemption is if it is "maintained by an organization, whether a civil law corporation or

otherwise, the principal purpose or function of which is the administration or funding of a

plan or program for the provision of retirement benefits or welfare benefits, or both, for

the employees of a church or a convention or association of churches, if such

organization is controlled by or associated with a church or a convention or association

of churches." 29 U.S.C. § 1002(33)(C)(I).  I thus turn to examine the Plan administrator,

the DB Plan Subcommittee, more closely.

There is no serious dispute that the principal purpose of the DB Plan

Subcommittee is to administer the Plan.  The only remaining question therefore is

whether the Subcommittee is controlled by or associated with the Catholic Church.

 "[T]he intent of § 1002(33)(C)(I) . . . is to require that if an organization controlled by or

associated with a church wants to hire an administrator for its plan, the administrator

must also be controlled by or associated with the church." ***Friend v. Ancilla Systems,

Inc***., 68 F.Supp.2d 969,  973 (N.D. Ill. 1999).[18]  This interpretation is consistent with

long-standing the IRS interpretations of the church plan exemption as well.  ***See* IRS

Private Letter Ruling** 201421031, 2014 WL 2136100 (May 23, 2014); **IRS Private

Letter Ruling** 8610268, 1985 WL 297663 (Dec. 26, 1985).  "Thus, . . .  the church plan

---

[18]  Indeed, were CHI not involved in the operations of the Subcommittee, I doubt plaintiff would have neglected to highlight this line of authority to the court.

exemption includes plans sponsored by church-affiliated organizations, such as hospitals or schools, if these plans are administered by plan committees (1) whose principal function is to administer the plan, (2) if the plan committee is controlled by or associated with a church." *Overall v. Ascension*, 23 F.Supp.3d 816, 829 (E.D. Mich. 2014).   Thus plaintiff's hyperbolic suggestion that the Subcommittee is a "sham" because it does not operate independently of CHI, if true, actually contains the seeds of its own undoing.

Although it seems the Subcommittee likely would meet the standards developed by the courts for finding that an organization is "controlled by" the church,[19] I find it unnecessary to address that question, as the Subcommittee plainly is "associated" with the Catholic Church.   Under ERISA,  an organization is "associated with" a church "if it shares common religious bonds and convictions with that church."   29 U.S.C. § 1002(33)(C)(iv).   In making this determination, plaintiff urges me to adopt the test first proposed by the Fourth Circuit in *Lown v. Continental Casualty Co.*, 238 F.3d 543 (4th Cir. 2001), and later appropriated by the Eighth Circuit in *Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006), which proposes three non-exclusive factors purportedly bearing on whether an organization shares common religious bonds with a church:

(1) whether the religious institution plays an official role in

---

[19]   Although ERISA does not define the phrase "controlled by," "[c]ourts have interpreted the provision as referring to corporate control, such as church control over appointment of a majority of the non-church organization's officers or Board of Directors." *Catholic Charities of Maine, Inc. v. City of Portland*, 304 F.Supp.2d 77, 85 (D. Me. 2004).  This definition also is consistent with the IRS's interpretation of this phrase.  *See* 26 C.F.R. § 1.414(e)-1(d)(2) (providing that "an organization, a majority of whose officers or directors are appointed by a church's governing board or by officials of a church, is controlled by a church" for the purposes of the Code).

> the governance of the organization, (2) whether the
> organization receives assistance from the religious
> institution, and (3) whether a denominational requirement
> exists for any employee or patient/customer of the
> organization.

*Lown*, 238 F.3d at 548.

For present purposes, I will set aside that this test appears to have been crafted

out of whole cloth and that it seems to take a rather cramped view of what it means for

two entities to share common religious bonds.  Nevertheless, as regards the first two

*Lown* factors, those considerations weigh in favor of a finding of association here.

Crediting plaintiff's suggestion that CHI essentially controls the Subcommittee, CHI's

obvious affinities with the Catholic Church recited above necessarily flow downward to

and animate the Subcommittee as well, a point driven home explicitly in the Plan

document, which requires the Subcommittee to be guided by the same mission and

principles as CHI.  Moreover, assuming that "assistance" as used in the second *Lown*

factor is meant to refer to financial backing, all the Subcommittee's expenses are paid

by CHI.[20]

As for the third *Lown* factor – whether the organization imposes denominational

requirements for employees or patients – it seems at best unhelpful, at least in this

case, where the evidence overwhelmingly shows not only that, regardless of the

personal convictions of any single employee, both CHI and the DB Plan Subcommittee

are animated by and bound to Catholic doctrines in the performance of their duties.  At

worst, such considerations run afoul of the First Amendment, which preclude the court

---

[20]  Members are not compensated for their service on the Subcommittee . (**CHI Motion App.**,
Exh. 1 § 12.1 at 42.)

from accepting plaintiff's invitation to delve into the doctrinal particulars of Catholic orthodoxy to determine, for instance, whether CHI's partnerships with non-Catholic institutions are consistent therewith:

> The First Amendment creates a protected zone for churches to decide these issues of religious doctrine free from government intrusion.  This protected zone includes:  (1) a church's law and doctrine; (2) a church's religious mission; and (3) a church's polity, administration, and community. . . . The First Amendment "plainly forbids" courts from inquiring into this departure-from-doctrine claim.

*Overall*, 23 F.Supp.3d at 832 (internal citations omitted).[21]  Although plaintiff accurately notes that this proscription does not apply to purely secular disputes which happen to involve a church-affiliated entity, *see General Council on Finance and Administration of the United Methodist Church v. California Superior Court*, 439 U.S. 1369, 1373, 99 S.Ct. 35, 38, 58 L.Ed.2d 77 (1978) (Rehnquist, J.), plaintiff's arguments here would require the court to probe at the core of Catholic doctrine, and thus are inappropriate for judicial determination.

Moreover, and beyond *Lown*, the court's previous recitation of the history, purpose, and structure of CHI should make evident that both CHI and the DB Plan Subcommittee plainly share common religious bonds and convictions with the Catholic Church.  Indeed, the entire reason for CHI's existence is to allow the Church to pursue its faith-based healing ministry in the secular world, and the Subcommittee must keep that mission at the forefront in its administration of the Plan.  Accordingly, I find and conclude that the CHI Plan qualifies as a church plan under subsection 1002(33)(C).

---

[21]  The *Overall* court declined to consider issues similar to those plaintiff presses here:  "(1) hiring and treatment of non-Catholics; (2) pastoral support for non-Catholic patients; (3) investment in alleged high-risk venture capital projects; and (4) performing contraceptive sterilization procedures." *Overall*, 23 F.Supp.3d at 832.

As noted above, however, a plan which otherwise meets the requirements section 1002(33)(A) or section 1002(33)(C) nevertheless will not qualify as a church plan, *inter alia*, "if less than substantially all of the individuals included in the plan" are not employees of a church.  29 U.S.C. § 1002(33)(B)(ii).  The parties agree that "substantially all" in this context means that at least 85 per cent off covered employees must be employees of a church.  ***See Continental Casualty Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund***, 916 F.2d 1154, 1158 (7th Cir. 1990).  Plaintiff argues that the CHI Plan does not satisfy this criteria because it includes non-Catholic and for-profit entities, and more specifically, because more than 25 per cent of the Plan's participants are employees of Centura Health Corporation ("Centura").[22]

Regarding the former point, there is simply no requirement under ERISA that all entities covered by a church plan be associated with or controlled by a *single* church. ***See*** 26 C.F.R. §1.414(e)-1(c) (Treasury Regulation providing that multi-employer plan qualifies as church plan if, *inter alia*, "[e]ach of the employers is a church that is exempt from tax under section 501(a)").  At the time the IRS issued its Private Letter Ruling confirming the CHI Plan's church plan status in 2002, only 1.64 per cent of participants in the Plan were employed by non-tax-exempt entities.  (**CHI Motion App.**, Exh. 49 at CHI_0000713.)  Moreover, the evidence substantiates that CHI's policy is, and the DB Plan Subcommittee is tasked to ensure, that no more than three per cent of the Plan's employers are not tax-exempt church controlled entities, with the express goal of maintaining the CHI Plan's status as a church plan.  (*Id.*, Exh. 57 at CHI_00167359; 58

---

[22] For present purposes, I assume plaintiff's calculations as to the number of Centura employees covered by the Plan are correct.

at 171-173.)

Plaintiff's particular focus on Centura does not bear scrutiny either.  Centura is a joint venture between CHI and Adventist Health System Sunbelt Healthcare Corporation ("Adventist Health"), another church-affiliated hospital system.  Centura's two sole corporate members are Catholic Health Initiatives Colorado ("CHIC"), which is 100 per cent controlled by CHI, and PorterCare Adventist Health System ("PorterCare"), which is 100 per cent controlled by Adventist Health.  Both CHIC's and PorterCare's facilities are tax exempt, and each operates in accordance with the teachings of its respective founding church.  Moreover, Centura itself is listed in *The Official Catholic Directory* (*id.*, Exh. 34), which as discussed above, confirms its recognition as a constituent part of the Catholic Church.

I therefore ultimately find and conclude that the CHI Plan is properly classified as a church plan and thus is entitled to the benefit of the ERISA exemption for such plans. CHI is entitled to summary judgment on that basis.

### D.  IS THE CHURCH PLAN EXEMPTION CONSTITUTIONAL?

Despite the court's conclusion that the CHI Plan properly is classified as a church plan, plaintiff nevertheless insists that recognition of the exemption in this instance violates the First Amendment's Establishment Clause.  This argument is singularly unpersuasive.

Alleged violations of the Establishment Clause traditionally are analyzed using the tripartite test first articulated in ***Lemon v. Kurtzman***, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).  Applying the ***Lemon*** test, "government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an

excessive entanglement." ***Bauchman by Bauchman v. West High School***, 132 F.3d 542, 551 (10th Cir. 1997), ***cert. denied***, 118 S.Ct. 2370 (1998). Although Justice O'Connor later suggested a streamlined "endorsement test," ***see Lynch v. Donnelly***, 465 U.S. 668, 687-94, 104 S.Ct. 1355, 1366-70, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring),[23] and even later Supreme Court opinions hint that the ***Lemon*** analysis ultimately may be jettisoned all together, ***see  Van Orden v. Perry***, 545 U.S. 677, 685-86, 125 S.Ct. 2854, 2860-61, 162 L.Ed.2d 607 (2005) (plurality op.), "[u]ntil the Supreme Court overrules ***Lemon***, . . . it remains binding law in this circuit," ***O'Connor v. Washburn University***, 416 F.3d 1216, 1224 (10th Cir. 2005), ***cert. denied***, 126 S.Ct. 1469 (2006).  ***See also Fields v. City of Tulsa***, 753 F.3d 1000, 1010 (10th Cir.), ***cert. denied***, 135 S.Ct. 714 (2014).

"The purpose prong of the endorsement test asks whether the government's actual purpose is to endorse or disapprove of religion."  ***O'Connor***, 416 F.3d at 1224 (citation and internal quotation marks omitted).  "Unless the secular justification is a 'sham' or is 'secondary' to a religious purpose, we defer to the government's professed purpose[.]"  ***Weinbaum v. City of Las Cruces, New Mexico***, 541 F.3d 1017, 1031 (10th Cir. 2008).  Congress's expressed purpose in carving out the church plan exemption was precisely to avoid unnecessary entanglement with religion.  ***See*** 125 Cong. Rec. 10,052 (1979) (remarks of Sen. Talmadge); 124 Cong. Rec. 12,106 (1978) (remarks of Rep. Conable).  A Congressional purpose to "minimize governmental interfer[ence] with the decision-making process in religions . . . does not violate the Establishment Clause."

---

[23] "Applying Justice O'Connor's refined analysis, "the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred." ***Bauchman***, 132 F.3d at 551 (citation and internal quotation marks omitted).

***Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.***

***Amos***, 483 U.S. 327, 336, 107 S. Ct. 2862, 2868, 97 L. Ed. 2d 273 (1987).[24]  ***Lemon***'s

first prong therefore is satisfied.

The second ***Lemon*** factor considers the statute's effect, more particularly,

whether implementation thereof has "a principal or primary effect . . . that neither

advances nor inhibits religion."  ***Lemon***, 91 S.Ct. at 2111.  "For a law to have forbidden

'effects' under ***Lemon***, it must be fair to say that the government *itself* has advanced

religion through its own activities and influence."  ***Amos***, 107 S.Ct. at 2869 (emphasis in

original).  There is no such evidence in the record before me.  It is insufficient for plaintiff

to say, as she does, that the church plan exemption confers a benefit on CHI that is

unavailable to non-church-affiliated entities.  The Supreme Court

> has never indicated that statutes that give special
> consideration to religious groups are *per se* invalid. . . .
> [T]here is ample room for accommodation of religion under
> the Establishment Clause.  Where . . . government acts with
> the proper purpose of lifting a regulation that burdens the
> exercise of religion, we see no reason to require that the
> exemption comes packaged with benefits to secular entities.

*Id.*  Thus, plaintiff's reliance on precedent requiring courts to "take adequate account of

the burdens a requested accommodation may impose on nonbeneficiaries," ***Cutter v.***

***Wilkinson***, 544 U.S. 709, 720, 125 S. Ct. 2113, 2121, 161 L. Ed. 2d 1020 (2005), is

misplaced.  That principle applies when accommodation of a religious practice or

principle would impose burdens on non-adherents they would not otherwise be required

---

[24]  Plaintiff's argument to the contrary – that a government purpose to avoid excessive entanglement with religion is inapplicable to CHI because CHI is not a church – assumes what it seeks to prove.  Likewise, her suggestion that "the government acts with an improper purpose, in violation of ***Lemon***'s first prong, if it exempts religious entities from a generally applicable law that does not create excessive religious entanglement or substantial religious burden" (**Plf. Resp. Br.** at 33), begs the question whether application of ERISA to church plans would engender excessive entanglement.  Yet Congress expressly found that such would be precisely the effect of failing to exempt church plans from the ambit of ERISA.  Plaintiff presents nothing to suggest that such was not the true intent of Congress.

to bear.  **See, e.g.**, **Estate of Thornton v. Caldor, Inc.**, 472 U.S. 703, 708-10, 105

S.Ct. 2914, 1917-18, 86 L.Ed.2d 557 (1985).[25]  Assuming *arguendo* that exemption from

ERISA confers a benefit on church-affiliated entities, there is nothing in this record to

suggest that it correspondingly creates any greater burden on secular organizations in

complying with ERISA.

The third and final prong of **Lemon** inquires whether the statute requires

"excessive" government involvement in religious affairs, including whether such

involvement "is a continuing one calling for official and continuing surveillance leading to

an impermissible degree of entanglement."  **Walz v. Tax Commission of City of New**

**York**, 397 U.S. 664, 675, 90 S. Ct. 1409, 1414, 25 L. Ed. 2d 697 (1970).  As plaintiff

points out, consideration of any particular entity's entitlement to claim the church plan

exemption itself requires some involvement by government in the affairs of the entity.

Yet a statute does not flunk this prong of the test simply because it requires some level

of government involvement.  "The test is inescapably one of degree."  **Id.**, 90 S.Ct. at

1414.

---

[25]  The statute struck down in **Estate of Thornton** guaranteed any employee "who states that a particular day of the week is observed as his Sabbath, the right not to work on his chosen day."  105 S.Ct. at 2917 (citation and internal quotation marks omitted).  The Court held the law violated the Establishment Clause:

> In essence, the Connecticut statute imposes on employers and employees an absolute duty to conform their business practices to the particular religious practices of the employee by enforcing observance of the Sabbath the employee unilaterally designates.  The State thus commands that Sabbath religious concerns automatically control over all secular interests at the workplace; the statute takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath.

**Id.**  Because the statute failed to account for the potential "substantial economic burdens" to the employer as well as the "significant burdens on other employees required to work in place of the Sabbath observers," it was found to "contravene[] a fundamental principle of the Religion Clauses, so well articulated by Judge Learned Hand: 'The First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities.'" **Id.** at 2918 (quoting **Otten v. Baltimore & Ohio Railroad Co.**, 205 F.2d 58, 61 (2nd Cir. 1953)).

In that light, plaintiff's suggestion that ERISA compliance would involve far less entanglement with religion than recognition of the exemption is particularly perplexing. Ensuring ongoing ERISA compliance by church-associated entities undoubtedly would require long-term, continuing monitoring not involved in the relatively time-delimited analysis of a claim of entitlement to the exemption.  Even more disturbing, compliance with ERISA's fiduciary rules, which emphasize profits above all other considerations, potentially has devastating impact on CHI's socially responsible investment policies:

> [I]t has become generally accepted that ERISA-governed asset management may not be based on social investing. ERISA fiduciaries correctly understand that insofar as social investing is concerned, they do not have the same investment prerogatives as fiduciaries of state and local pension plans, church plans, and other programs not subject to ERISA. . . .  The risk-averse fiduciary will avoid activity that could be construed as symptomatic of nonfinancial motives, such as social investing. The investment decisions of risk averse fiduciaries should be based exclusively on economic merit.

LEE T. POLK, 1 ***ERISA Practice & Litigation*** § 3:40 (2013) (footnotes omitted).  These considerations clearly demonstrate that Congressional fears of excessive entanglement with religion in the absence of an exemption for properly qualified church plans was not illusory or without basis.

Accordingly, affording CHI the benefit of the church plan exemption works no violation of the First Amendment.

## IV.  CONCLUSION AND ORDERS

Based on the foregoing findings, I conclude that the CHI Plan is a church plan, and thus exempt from the requirements of ERISA.  Accordingly, CHI is entitled to summary judgment on plaintiff's claim seeking a declaration to the contrary.  As the remainder of plaintiff's claims depend on a finding that the CHI Plan fails to comply with various requirements of ERISA, all remaining claims likewise must be dismissed.

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendants' Motion for Summary Judgment** [#302], filed August 13, 2015, is granted in part and denied as moot in part as follows:

> a.  That the motion is granted to the extent it seeks summary judgment as to Count 1 of the **Amended Complaint** [#82], filed November 22, 2013, seeking a declaration that the CHI Plan is not a church plan within the meaning of ERISA; and

> b.  That in all other respects, the motion is denied as moot;

2.  That **Plaintiff's Motion for Partial Summary Judgment** [#308], filed August 13, 2015, is denied;

3.  That **Defendant Edward Speed's for Summary Judgment** [#296], filed August 13, 2015, is denied as moot;

4.  That all pending pretrial deadlines in this matter are vacated;

5.  That the combined Final Pretrial Conference and Trial Preparation Conference set for **Friday, December 18, 2015**, at **10:00 a.m.**, and the bench trial set to commence on **January 4, 2016**, are vacated;

6.  That all pending motions, other than those regarding restriction under D.C.COLO.LCivR 7.2,[26] are denied as moot, including but not limited to the following:

> a.  **Defendants' Motion To Exclude Testimony and Evidence of Professor John Langbein and Supporting Memorandum of Law** [#264], filed July 9, 2015;

> b.  **Plaintiff's Motion To Exclude the Testimony of M. Therese Lysaught Under Fed. R. Evid. 702** [#268-1], filed July 9, 2015;

---

[26] The court will address all such motions by one or more separate orders.

c.  **Plaintiff's Motion To Exclude Testimony of Robert J. Walling, III Under Fed. R. Evid. 702** [#269-1], filed July 9, 2015;

d.  Defendants' **Motion To Exclude Expert Report and Testimony of Daniel I. Halperin, with Supporting Memorandum of Law** [#271], filed July 9, 2015;

e.  **Plaintiff's Motion To Exclude Testimony of Nicholas P. Cafardi Under Fed. R. Evid. 702** [#272-1], filed July 9, 2015;

f.  **Defendants' Motion To Exclude Testimony and Evidence of Professor Mark Loewenstein and Memorandum of Law in Support** [#295], filed July 9, 2015;

g.  **Plaintiff's Motion *In Limine* To Exclude the Subject of Canon Law** [#375], filed November 16, 2015; and

h.  **Plaintiff's Motion *In LImine* To Exclude the Subject of Roman Catholic Moral Theology** [#277], filed November 16, 2015;

7.  That judgment with prejudice shall enter on behalf of defendants, Catholic Health Initiatives, a Colorado corporation; Geraldine Bednash; Maureen Comer; Richard Corrente; David R. Edwards; Katherine Gray; Barbara Hagedorn; James Hamill; Antoinette Hardy-Waller; Phyllis Hughs; Donald Jones; Andrea J. Lee; David R. Lincoln; Kevin E. Lofton; Christopher R. Lowney; Eleanor F. Martin; Mary Margaret Mooney; Lillian Murphy; Mary Jo Potter; Patricia Smith; Edward Speed; Dean Swindle; Patricia G. Webb; and John and Jane Does 1-10, and against plaintiff, Janeen Medina,[27] individually and on behalf of all others similarly situated, and on behalf of the CHI Plans; and

---

[27] Now known as Janeen West.  (*See* **Notification of Plaintiff's Change of Last Name** [#370], filed October 15, 2015.)

8.  That defendants are awarded their costs to be taxed by the clerk of the court in the time and manner required by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated December 8, 2015, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge